# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE CYAN, INC. STOCKHOLDERS LITIGATION | CONSOLIDATED C.A. No. 11027-CB |

## MEMORANDUM OPINION

Date Submitted: February 7, 2017
Date Decided: May 11, 2017

Michael Van Gorder, FARUQI & FARUQI, LLP, Wilmington, Delaware; Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, and Jeremy J. Riley, RIGRODSKY & LONG, P.A., Wilmington, Delaware; Shane T. Rowley, LEVI & KORSINSKY LLP, New York, New York, *Attorneys for Plaintiffs*.

Bradley D. Sorrels, Ian R. Liston, Andrew D. Berni, and Jessica A. Montellese, WILSON SONSINI GOODRICH & ROSATI, PC, Wilmington, Delaware; Boris Feldman and Ignacio E. Salceda, WILSON SONSINI GOODRICH & ROSATI, PC, Palo Alto, California, *Attorneys for Defendants Mark A. Floyd, Michael L. Hatfield, Promod Haque, Paul A. Ferris, Michael J. Boustridge, Niel Ransom, and Robert E. Switz*.

**BOUCHARD, C.**

This action arises out of the merger of Cyan, Inc. and Ciena Corporation that closed in August 2015. In exchange for their Cyan shares, the former stockholders of Cyan received shares of Ciena common stock and cash that accounted for 89% and 11%, respectively, of an estimated $335 million in merger consideration.

Plaintiffs identified a host of alleged disclosure deficiencies in Cyan's proxy statement, but they elected not to seek injunctive relief to cure any of them before the stockholders' meeting, and the transaction closed after receiving the approval of 98% of the shares that voted. Almost one year later, plaintiffs filed their current complaint, advancing two claims.

Count I asserts that the members of Cyan's board breached their fiduciary duties in approving the merger, primarily on the theory that the directors were motivated out of self-interest to bolster their indemnification rights in the face of a pending securities litigation to partner Cyan with a company with "deeper pockets." Count II seeks equitable relief in the form of quasi-appraisal. Defendants moved to dismiss both claims for failure to state a claim for relief. For the reasons explained below, I conclude that both claims are without merit and the Complaint must be dismissed.

Count I fails to state a claim for relief for two independent reasons. First, because the merger consideration primarily consisted of stock in a publicly traded company, the board's approval of the transaction is presumptively governed by the

business judgment rule and plaintiffs have failed to plead sufficient facts to support a reasonable inference that a majority of Cyan's board was interested in the transaction or acted in bad faith so as to sustain a non-exculpated claim for breach of fiduciary duty. Second, a majority of disinterested stockholders of Cyan approved the merger in a fully informed, uncoerced vote.

Dismissal of Count II logically follows from the dismissal of Count I. As this Court has previously held, quasi-appraisal is simply a form of remedy, typically sought to address disclosure deficiencies that are the product of a fiduciary breach. Because plaintiffs have failed to identify any material misrepresentation or omission in Cyan's proxy statement, or to allege any other viable claim for a fiduciary breach, there is no basis to impose a quasi-appraisal remedy in this case.

## I. BACKGROUND

Unless noted otherwise, the facts recited in this opinion come from the allegations of the Verified Third Amended Class Action Complaint (the "Complaint") and documents incorporated therein. Any additional facts are either undisputed or subject to judicial notice.

### A. The Parties and Relevant Non-Parties

Under an agreement and plan of merger dated May 3, 2015 (the "Merger Agreement"), Ciena acquired all of the outstanding shares of Cyan in a merger transaction with an enterprise value of approximately $335 million, net of estimated

2

cash (the "Merger"). Plaintiffs are individuals who allege they were stockholders of Cyan at all relevant times.

Before the Merger, Cyan was a Delaware corporation with its principal executive offices in California. Cyan provided various carrier-grade networking solutions in North America, Asia, and Europe. Its common stock was traded on the New York Stock Exchange under the symbol "CYNI."

Ciena is a Delaware corporation focused on providing communications networking solutions. Ciena's common stock trades on the New York Stock Exchange under the symbol "CIEN."

Defendants were the seven members of Cyan's board of directors who approved the Merger. Two of them were members of management; the other five were outside directors.

Defendant Mark A. Floyd was Cyan's Chief Executive Officer and Chairman of the Board, and served on Cyan's three-member Strategic/Finance Committee.[1] Defendant Michael L. Hatfield, a co-founder of Cyan, served as Cyan's President.

Defendant Promod Haque was an outside director of Cyan. He also was the senior managing partner and co-CEO of Norwest Venture Partners ("Norwest"), which held 22.71% of Cyan's outstanding shares and was Cyan's largest stockholder

---

[1] Floyd was removed from the Strategic/Finance Committee when the committee was tasked with approving a convertible debt offering, discussed below, but he was re-appointed in connection with the process that led to the Merger.

3

as of the date of the Merger Agreement. Haque had voting control and dispositive power over Norwest's holdings.

Defendant Paul A. Ferris was an outside director of Cyan and served on Cyan's Strategic/Finance Committee. He also was the general partner and managing member of Azure Capital Partners ("Azure"). Azure was Cyan's second largest stockholder, holding 12.4% of the company's outstanding shares when the Merger closed. Ferris had voting and dispositive power over the shares Azure held.

Defendants Michael J. Boustridge, Niel Ransom, and Robert E. Switz were the remaining members of the Cyan board. Each was an outside director. Switz served on Cyan's Strategic/Finance Committee.

**B.     The Securities Litigation in California**

On April 1, 2014, two pension funds filed a securities class action in California state court asserting violations of the Securities Act of 1933 in connection with Cyan's initial public offering in May 2013 (the "Securities Litigation"). The defendants in the Securities Litigation include Cyan, the seven members of its board of directors who are defendants in this action, Jefferies LLC, and several other firms that served as underwriters for the IPO: Goldman, Sachs & Co., J.P. Morgan Securities LLC, and Pacific Crest Securities LLC.

On or about May 18, 2015, a class was certified in the Securities Litigation consisting of "[a]ll persons who purchased or otherwise acquired Cyan common

stock from May 9, 2013 to November 4, 2013, except for purchases or acquisitions of non-registered shares in a private transaction," and excluding certain affiliates of the defendants in the Securities Litigation and any person who validly requests exclusion from the class.[2] The action remains pending as of the date of this opinion. Cyan is obligated to indemnify Jefferies and the Cyan directors for damages that could result from the Securities Litigation.

### C. Cyan Issues Convertible Debt

On May 22, 2014, during a meeting of Cyan's board of directors, management informed the board that Cyan only had sufficient cash to survive through the second quarter of 2015. Preliminary discussions with several potential lenders indicated that Cyan might only be able to secure modestly more debt than what was available at the time under its existing credit facility.

In early June 2014, Floyd (Cyan's CEO) held discussions with representatives of Jefferies concerning opportunities for Cyan to raise additional capital. On July 2 and again on July 23, representatives from Morgan Stanley & Co. LLC expressed the view that it would be difficult for Cyan to raise additional capital absent one or more key business developments, such as a major customer win.

---

[2] *Beaver Cty. Empls. Ret. Fund v. Cyan, Inc.*, No. CGC-14-538355 (Cal. Super. Ct. May 19, 2015) (ORDER).

On August 6, 2014, after having discussions with Morgan Stanley and Jefferies, the Cyan board determined that Cyan could raise additional capital through a convertible debt offering (the "Convertible Debt Offering"). By December 4, 2014, however, the board had not been able to secure sufficient commitments from unaffiliated investors to satisfy certain minimum investment conditions for the proposed Convertible Debt Offering. As a result, the two management directors on Cyan's board (Hatfield and Floyd), an investment firm controlled by one of its outside directors (Norwest), and Jefferies agreed to invest in the offering in the following amounts: $4 million, $2 million, $11 million, and approximately $5 million, respectively. The Convertible Debt Offering ultimately raised $50 million.

Under the indenture governing the convertible notes, if the notes are converted in connection with a merger, the converting note holder would receive the same consideration that a holder of the number of shares of Cyan common stock into which such notes were convertible immediately before the merger would have been entitled to receive in the merger, subject to the acquirer's right to elect to pay cash in lieu of issuing shares. The indenture also contained a "make-whole" provision under which, for a certain period of time, the note holders could require a purchaser

to repurchase their convertible notes at 100% of the principal amount plus accrued and unpaid interest if a "Fundamental Change" occurs.[3]

### D.  Cyan's Financial Performance Improves

In 2014 and the first quarter of 2015, Cyan reported continuous revenue growth and improving liquidity.  It reported revenues of $19 million, $24.4 million, $26.6 million, and $30.5 million for the first, second, third, and fourth fiscal quarters of 2014, respectively, and $36 million in revenue for the first fiscal quarter of 2015.  As of March 31, 2015, Cyan had cash and cash equivalents on hand of $53.87 million.

By February 10, 2015, Cyan had received a $28 million purchase order from its largest customer, Windstream Corporation.  The Windstream order was expected to be filled across the first three quarters of 2015, and management believed that there could be a second round of orders from Windstream in the following months.  Management revised its internal revenue outlook for 2015 to incorporate the Windstream order and its outlook for 2016 and 2017 based on Windstream and other generally positive momentum in the business.  Due to these developments,

---

[3] More specifically, the proxy statement for the Merger explained that, under certain circumstances, "Cyan will in addition to the other consideration payable or deliverable in connection with such conversion make an interest make-whole payment to converting holders equal to the sum of the present value of the remaining scheduled payments of interest that would have been made on the convertible notes to be converted had such convertible notes remained outstanding until December 15, 2017 computed using a discount rate equal to 2%."  Compl. ¶ 47.

management prepared a 2015 momentum plan, which increased the 2015 revenue projection above the level of the previously approved operating plan.

On April 6, 2015, Cyan's board noted the company's increased dependence on Windstream. It also noted that United States government stimulus spending was driving recent business activity in part, and that it was uncertain whether the increased level of Windstream business could be sustained through all of 2015 and 2016.

### E.     Cyan Enters into a Merger Agreement with Ciena

During the same period when Cyan was conducting the Convertible Debt Offering and its operational results were improving, it also explored potential strategic opportunities with other companies. A sale process began around April 2014, when a third party contacted Cyan's Chief Financial Officer to express its interest in learning about Cyan's business. On December 17, 2014, Cyan's board enlisted Jefferies' assistance for the sale process.

During a meeting on January 27, 2015, Cyan's management and the Strategic/Finance Committee "discussed the fact that Jefferies had purchased, and was still holding, $5.5 million of the Company's 8% convertible notes and the related warrants and, as such, **would** have an interest in the outcome of a strategic

transaction in addition [to] the fee arrangement in the advisory engagement."[4]  The General Counsel of Cyan "noted that the Committee and, eventually the full Board, would want to consider these factors in connection with evaluating the advice and, if applicable, any fairness opinion by Jefferies."[5]  The board also considered Jefferies' potential conflict of interest because of its status as a defendant in the Securities Litigation, but ultimately decided to keep Jefferies involved in the sale process.

On January 29, 2015, Hatfield learned that Ciena, which had been engaged in discussions to acquire Cyan, would prefer him to stay with the company following a transaction.

On April 9, 2015, Cyan's General Counsel and representatives of its outside counsel, Wilson Sonsini Goodrich & Rosati, P.C., participated in a call with representatives of Ciena and its outside counsel, Hogan Lovells US LLP, to discuss how Cyan's outstanding convertible notes and warrants would be treated in a proposed strategic transaction.  Representatives of Hogan Lovells expressed Ciena's concern that the note holders' security interests in Cyan's assets and the negative covenants in the convertible notes would continue to apply after the closing based on the structure of the proposed transaction that was under consideration.  They also

---

[4] Compl. ¶ 52 (emphasis in original).

[5] Compl. ¶ 52.

conveyed Ciena's preference for the proposed transaction to be structured in a way that would qualify as a "Fundamental Change," which would cause the security interests and the negative operating covenants to terminate after the closing. Representatives of Hogan Lovells then discussed that a "Fundamental Change" could be triggered in a transaction in which the consideration paid for Cyan common stock was a mix of both cash and stock.

On April 18, 2015, representatives of Hogan Lovells participated in a call with representatives of Wilson Sonsini to discuss Ciena's requirement that the form of merger consideration be adjusted to consist of both cash and stock so as to trigger a "Fundamental Change" under the indenture for the convertible notes. On April 21, representatives of Jefferies participated in a call with Ciena's financial advisor, Morgan Stanley, during which representatives of Morgan Stanley formally proposed that the form of merger consideration Ciena was offering be changed from all stock to a mix of 11% cash and 89% stock in order to trigger a "Fundamental Change." The stock component of the merger consideration would be measured by the value of Ciena's common stock at closing.

On April 26, 2015, Ciena provided a draft employment term sheet to Hatfield. He then participated in a call with representatives of Ciena to review and discuss the employment terms, as well as the terms of similar term sheets for eight other Cyan employees that Ciena had identified during the due diligence process.

On April 28, 2015, the Strategic/Finance Committee decided that it would be advisable to contact Houlihan Lokey Capital, Inc. for a second fairness opinion. On April 30, during a board meeting, an attorney from Wilson Sonsini "made note of the fact that certain members of the Board, and Jefferies, held convertible notes and related warrants of the Company, the ownership of which could be interpreted as creating a possible conflict of interest."[6]

On April 29, and continuing through until a final term sheet was signed on May 3, 2015, Hatfield, with the assistance of independent counsel, negotiated the terms of his employment with representatives of Ciena.

On May 3, 2015, Houlihan Lokey rendered a fairness opinion concerning the Merger. The board unanimously approved the Merger the same day.

On May 4, 2015, Ciena issued a press release announcing the Merger, which stated in relevant part that:

> **HANOVER, Md. – May 4, 2015 – Ciena® Corporation (NYSE: CIEN)**, the network specialist, has entered into a definitive agreement to acquire Cyan Inc. (NYSE: CYNI), a leading provider of next-generation software and platforms to enable open, agile and scalable software-defined networks. Under the terms of the agreement, Ciena will acquire all of the outstanding shares of Cyan in a cash and stock transaction currently valued at approximately $400 million (or $335 million, net of estimated cash acquired) and inclusive of Cyan's outstanding convertible notes on an as-converted basis.
>
> . . .

---

[6] Compl. ¶ 105(d).

<u>Transaction Terms and Timing</u>

Upon the closing of the transaction, Cyan shareholders will receive consideration equal to the value 0.224 shares of Ciena common stock (89% of which will be delivered in Ciena common stock and 11% will be delivered in cash based on the value of Ciena common stock at closing). This exchange ratio represents $4.75 per share of Cyan common stock, based on Ciena's 20-day volume weighted average price as of May 1, 2015. Based on the structure of the transaction, Cyan's outstanding warrants will be deemed to have been automatically exercised upon closing. In addition, Ciena will also assume Cyan's outstanding equity awards.

In connection with the acquisition, Ciena will assume Cyan's $50 million in outstanding principal amount of 8.0% Convertible Senior Secured Notes due 2019. Under the terms of the indenture, for a period following closing, the note holders may elect to convert such notes at an increased conversion rate, or alternatively require that all or a portion of their notes be purchased for cash at a purchase price equal to the principal plus accrued interest. In the event that any note holders do not make either such election, such notes will become obligations of Ciena.[7]

## F.    Litigation Ensues and the Transaction Closes

Beginning on May 15, 2015, five purported class actions were filed in this Court challenging the proposed transaction. On June 23, 2015, these five actions were consolidated and co-lead counsel was appointed.

On June 26, Ciena filed an amendment to its Form S-4 Registration Statement with the Securities and Exchange Commission, attaching Cyan's preliminary proxy

---

[7] Compl. ¶ 70.

statement (the "Proxy").[8]  On June 30, Cyan filed a definitive proxy statement recommending that Cyan's stockholders vote in favor of the Merger.

In mid-July 2015, defendants made a voluntary production of documents to plaintiffs' counsel.  On July 20, 2015, after reviewing the documents that were produced to them, plaintiffs sent a letter to Cyan's counsel demanding that Cyan supplement its disclosures in the Proxy.  Cyan declined to do so.

On July 31, 2015, stockholders of Cyan holding approximately 71% of Cyan's outstanding common stock voted to approve the Merger, with approximately 98% of those voting expressing their approval.[9]  The Merger closed on August 3, 2015.

## G.    Procedural History

Plaintiffs' initial complaint sought to enjoin the Merger.  As noted above, plaintiffs also demanded that Cyan supplement its Proxy before the stockholders' meeting scheduled to consider the proposed merger, which request Cyan rebuffed.

---

[8] *See* Liston Aff. Ex. 1.  The Complaint refers to the preliminary proxy statement and the definitive proxy statement interchangeably for purposes of the disclosure claims, and the parties briefed the disclosure claims based on the preliminary proxy statement.  Because the relevant sections of the two proxy statements are identical, I base my analysis on the preliminary proxy statement as well.

[9] *See* Liston Aff. Ex. 5 (Cyan, Inc. Form 8-K (Aug. 3, 2015)), at 3 (49,311,592 shares outstanding, 35,088,780 shares voted "for," 836,900 voted "against," and 90,044 shares abstained).  *See also In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170-71 (Del. 2006) (holding that the Court of Chancery may take judicial notice of the result of a stockholder vote approving transactions where there was no reasonable dispute about the vote).

Plaintiffs nevertheless did not file a motion for expedition or preliminary injunctive relief.

On July 15, 2016, almost one year after the Merger closed, plaintiffs filed the Verified Third Amended Class Action Complaint, asserting two claims. Count I asserts that the seven members of Cyan's board breached their fiduciary duties in connection with their approval of the Merger. Count II asserts that defendants withheld material information that prevented Cyan's stockholders from determining "whether to pursue their statutory appraisal rights,"[10] and asks the Court to award the remedy of quasi-appraisal.

On July 19, 2016, defendants filed a motion to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. On February 6, 2017, after observing that plaintiffs had asserted a lengthy list of alleged disclosure deficiencies in their opposition brief, the Court asked plaintiffs to file a letter before the hearing on the motion to dismiss "identifying what plaintiffs believe are their three strongest disclosure claims."[11] Plaintiffs' counsel did so later that same day.

## II. ANALYSIS

The standards governing a motion to dismiss for failure to state a claim for relief are well settled:

---

[10] Compl. ¶ 136.

[11] Letter to Counsel (Tr. ID 60164357 Feb. 6, 2017).

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[12]

Although the standard is a minimal one, the Court "will not credit conclusory allegations or draw unreasonable inferences in favor of the Plaintiffs."[13]  The Court also "is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[14]

For the reasons explained below, I conclude that Count I for breach of fiduciary duty must be dismissed for two independent reasons.  First, plaintiffs have failed to plead sufficient facts to support a reasonable inference that the directors of Cyan breached their duty of loyalty or acted in bad faith in connection with the Merger.  Second, a majority of disinterested stockholders of Cyan approved the Merger in a fully informed, uncoerced vote.  Thus, under *Corwin v. KKR Financial Holdings LLC* and its progeny, the transaction can only be attacked on the ground of waste, which plaintiffs do not allege.[15]

---

[12] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

[13] *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *5 (Del. Ch. Jan. 31, 2013).

[14] *Gen. Motors (Hughes)*, 897 A.2d at 168.

[15] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 308-09 (Del. 2015); *Singh v. Attenborough*, 137 A.3d 151, 151-52 (Del. 2016).

I also conclude that dismissal of Count II for quasi-appraisal logically follows from the dismissal of Count I. As an initial matter, plaintiffs' request for quasi-appraisal is premised on disclosure deficiencies alleged in the Complaint but, as discussed below, the former stockholders of Cyan were not deprived of any material information in deciding whether to seek appraisal. The cause of action underlying the quasi-appraisal remedy that plaintiffs seek, moreover, is in reality a claim for breach of the fiduciary duty of disclosure. Because plaintiffs have failed to state a non-exculpated claim for breach of fiduciary duty, they cannot obtain quasi-appraisal as a remedy.

## A.     Plaintiffs Fail to Plead a Non-Exculpated Breach of Fiduciary Duty

Under the Merger Agreement, the former stockholders of Cyan received 89% of the merger consideration in the form of Ciena common stock and the rest in cash. Because the merger consideration primarily consisted of stock in a publicly traded company, enhanced scrutiny under *Revlon*[16] does not apply, as plaintiffs sensibly concede.[17] Plaintiffs also do not allege that the transaction triggers *Unocal* or should

---

[16] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986).

[17] Pls.' Answering Br. 48. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995) (internal quotations and citations omitted) (holding that enhanced scrutiny under *Revlon* did not apply to the transaction where 67% of merger consideration was to be paid to stockholders in the form of publicly traded stock in the surviving company and explaining that plaintiffs had "failed to allege that control of Burlington and Santa Fe after the merger would not remain in a large, fluid, changeable and changing market.").

16

be subject to the entire fairness review *ab initio.*[18] Thus, the business judgment rule presumptively applies to the Court's review of the transaction, and the Court will not second-guess a board's decision unless that decision "cannot be attributed to any rational business purpose."[19]

Cyan's certificate of incorporation contained an exculpatory provision permitted under 8 *Del. C.* § 102(b)(7).[20] Accordingly, to survive the motion to dismiss, plaintiffs must state a claim that a majority of defendants acted in bad faith or otherwise breached their duty of loyalty.[21] As this Court stated in *Orman v. Cullman*, where self-dealing is not involved, one must allege facts from which it reasonably may be inferred that a director's interest in a transaction is material to that director in order to sustain a claim for breach of the duty of loyalty:

> in the absence of self-dealing, it is not enough to establish the interest
> of a director by alleging that he received any benefit not equally shared
> by the stockholders. Such benefit must be alleged to be material to that
> director. Materiality means that the alleged benefit was significant

---

[18] *See Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002) ("Usually, the entire fairness standard only applies at the outset ('*ab initio*') in certain special circumstances, viz, a squeeze out merger or a merger between two companies under the control of a controlling shareholder.").

[19] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[20] Liston Aff. Ex. 8, at 5 Article 8.1 ("To the fullest extent permitted by the DGCL, as it presently exists or may hereafter be amended from time to time, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director."). *See Khanna v. McMinn*, 2006 WL 1388744, at *30 (Del. Ch. May 9, 2006) ("[T]he Court may take judicial notice of matters that are not subject to reasonable dispute.").

[21] *See In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009).

enough in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.[22]

Well-pleaded allegations that the board did not act in good faith also would state a claim for breach of the duty of loyalty sufficient to survive a motion to dismiss. In general, "bad faith will be found if a fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties,"[23] or if "the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[24]

After carefully reviewing the allegations in the Complaint, I conclude that plaintiffs have failed to plead sufficient facts to support a reasonable inference that a majority of Cyan's board were interested in the Merger or acted in bad faith.

### 1. Plaintiffs Fail to Plead Sufficient Facts Supporting a Reasonable Inference that a Majority of Cyan's Board Was Interested in the Transaction

Plaintiffs identified in their brief three sources of conflicts that allegedly rendered members of Cyan's board interested in the Merger. I address each in turn.

First, plaintiffs allege that all of Cyan's directors were "conflicted because they were motivated to secure a buyer with deep pockets to ensure they would be

---

[22] *Orman*, 794 A.2d at 23 (internal quotations omitted).

[23] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

[24] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000).

indemnified from the high litigation exposure associated with the Cyan Securities Litigation due to the Company's uncertain cash position."[25]  According to plaintiffs, the damages exposure in the Securities Litigation is "roughly $141 million" based on the drop in Cyan's stock price during the relevant period ($2.88 per share) multiplied by total number of shares outstanding shortly before the Merger.[26]  Thus, according to plaintiffs, "a judgment in the Securities Class Action could crush the Company's fragile financial condition and . . . the Board was substantially motivated to approve the Transaction to ensure they would in fact be indemnified."[27]

There is a significant and indisputable flaw in this theory.  Plaintiffs overlook the fact that not all stockholders of Cyan at the time of the Merger could be members of the class certified in the Securities Litigation, which concerns disclosures Cyan made in connection with its initial public offering.[28]  As disclosed in its Form 10-K

---

[25] Compl. ¶ 83.

[26] Tr. Oral Arg. 76 (Feb. 7, 2017); *see also* Compl. ¶ 35.

[27] Pls.' Answering Br. 35.

[28] The class in the Securities Litigation is defined as:  "All persons who purchased or otherwise acquired Cyan common stock from May 9, 2013 to November 4, 2013, except for purchases or acquisitions of non-registered shares in a private transaction," and excluding certain affiliates of the defendants and any person who validly requests exclusion from the class. *Beaver Cty. Empls. Ret. Fund*, No. CGC-14-538355 (Cal. Super. Ct. May 19, 2015) (ORDER).  "May 9, 2013" is "the date of the initial public offering," and "Cyan has represented . . . that non-IPO shares first traded on November 5, 2013."  Pls.' Supplemental Filing in Support of Class Certification 2, in *Beaver Cty. Empls. Ret. Fund* (Apr. 7, 2015).  *See Khanna*, 2006 WL 1388744, at *30 ("[T]he Court may take judicial notice of matters that are not subject to reasonable dispute.").

for the fiscal year 2014, Cyan sold 8.899 million shares of common stock in the initial public offering.[29] Assuming all purchasers or acquirers of Cyan common stock issued in the initial public offering are class members in the Securities Litigation, and accepting as true the alleged damages exposure of $2.88 per share—which plaintiffs admit is the maximum exposure[30]—the total amount of damages that could result from the Securities Litigation is approximately $25.6 million—not $141 million.[31]

Putting aside that securities litigation rarely leads to a 100% recovery, when the maximum exposure from the Securities Litigation is put in proper perspective, it is not reasonably conceivable in my view from the facts alleged in the Complaint that the directors of Cyan had a disabling conflict of interest when they approved the Merger based on their alleged desire to "ensure there would be sufficient cash so they will continue to be indemnified."[32] This conclusion is based on the following: (1) Cyan is obligated to indemnify the board members;[33] (2) the board members also

---

[29] Cyan, Inc., Form 10-K (Mar. 27, 2015), at 47, *available at* https://www.sec.gov/Archives/edgar/data/1391636/000139163615000042/cyni-12312014x10k.htm#s3DFFE08A6EAFD5E1D6FCBBAE710D3FE6.

[30] Tr. Oral Arg. 79, 102.

[31] The first time defendants quantified the maximum exposure in the Securities Litigation at approximately $25.6 million was during oral argument. The Court thus permitted plaintiffs to make a supplemental submission if they disagreed with the calculation. Tr. Oral Arg. 108. Plaintiffs did not do so.

[32] Compl. ¶ 4.

[33] Compl. ¶ 35.

are protected by D&O insurance;[34] (3) Cyan had cash and cash equivalents of $53.87 million as of March 31, 2015,[35] and its operational results were improving before the Merger;[36] (4) there were other deep pockets from which plaintiffs in the Securities Litigation could obtain recovery apart from Cyan, such as Jefferies, Goldman Sachs, J.P. Morgan Securities, and Pacific Crest Securities;[37] (5) plaintiffs have not identified any documentary evidence or pled any specific facts from the discovery they obtained suggesting that the exposure from the Securities Litigation motivated the board's approval of the Merger; and (6) plaintiffs have not pled any non-conclusory facts to support the assertion that Ciena was a "deeper pocket" than Cyan—information that would be readily available from public sources.[38] Indeed, plaintiffs' theory is further undermined by the fact that, if Cyan truly lacked sufficient capital to satisfy the contractual indemnification obligations it owed to the defendants, as plaintiffs allege, any consideration its stockholders received in the Merger would amount to a windfall.

---

[34] *See* Liston Aff. Ex. 1, at 131, A-43 § 5.05 (c) (provision in the Merger Agreement requiring Ciena to continue the Cyan directors' existing liability insurance policies or obtain new policies).

[35] Compl. ¶ 84.

[36] *See* Compl. ¶¶ 56, 73-78.

[37] *See* Compl. ¶ 32; Tr. Oral Arg. 81 ("It's joint and several liability under the securities statute.").

[38] Tr. Oral Arg. 82-83.

Second, plaintiffs allege that Haque and Ferris, as affiliates of Cyan's two largest stockholders (Norwest and Azure), had interests "not aligned with other Cyan stockholders because their holdings are so sizable that the Transaction is their only opportunity to cash out without the scrutiny of the public markets."[39] This Court rejected a similar argument in *In re Synthes, Inc. Shareholder Litigation*, where the plaintiffs argued that Synthes, Inc.'s Chairman of the Board, who also was the company's controlling stockholder, "received liquidity benefits that were not shared equally with the rest of the stockholders and colored his decision to support the Merger."[40] Then-Chancellor Strine rejected the argument, explaining:

> Generally speaking, a fiduciary's financial interest in a transaction as a stockholder (such as receiving liquidity value for her shares) does not establish a disabling conflict of interest when the transaction treats all stockholders equally, as does the Merger. This notion stems from the basic understanding that when a stockholder who is also a fiduciary receives the same consideration for her shares as the rest of the shareholders, their interests are aligned.
>
> . . .
>
> It may be that there are very narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment. Those circumstances would have to involve a crisis, fire sale where the controller, in order to satisfy an exigent need (such as a margin call or default in a larger investment) agreed to a sale of the corporation without any effort to make logical buyers aware of the chance to sell, give them a chance to do due diligence, and to raise the financing

---

[39] Compl. ¶ 86.

[40] *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1034 (Del. Ch. 2012).

necessary to make a bid that would reflect the genuine fair market value of the corporation.[41]

Plaintiffs do not allege that Norwest or Azure received different consideration for their shares than other stockholders of Cyan, nor do they allege that Norwest or Azure had any "immediate need for liquidity" that amounted to "a crisis" or "fire sale." Therefore, consistent with *Synthes*, plaintiffs' bare allegation that Norwest and Azure wanted to "cash out without the scrutiny of the public markets" is insufficient to support a reasonable inference that Haque or Ferris faced a disabling conflict of interest in approving the Merger.[42]

Third, plaintiffs allege that Floyd, Hatfield, and Haque were "motivated to ensure a transaction occurred so they could either receive the make-whole payment from the convertible notes in connection with a fundamental change or in the alternative, keep the convertible notes outstanding, but tied to a much more financially secure company."[43] In the case of Haque, this alleged motivation concerned convertible notes held by Norwest, where Haque served as co-CEO and the senior managing partner.[44]

---

[41] *Id.* at 1035-36.

[42] *See In re Zale Corp. S'holder Litig.*, 2015 WL 5853693, at *9 (Del. Ch. Oct. 1, 2015) ("Although there are cases in which a plaintiff's allegations of a large stockholder's need for liquidity have been sufficient to defeat a motion to dismiss, the plaintiffs in those cases alleged much more specific liquidity needs than a simple desire to 'sell quickly.'").

[43] Compl. ¶ 84.

[44] Compl. ¶¶ 44, 47.

Plaintiffs' contention that the desire to obtain the make-whole payment created a material conflict of interest is open to serious question given that each of these individuals held (or indirectly benefitted from) a significant amount of Cyan stock and thus were motivated to maximize the exchange ratio in Cyan's favor. Specifically, the Complaint alleges that Floyd, Hatfield, and Norwest held, respectively, 0.83%, 4.76%, and 22.71% of Cyan's outstanding shares.[45] But even assuming that the interests of Floyd, Hatfield, and Haque in triggering the make-whole payment outweighed their interests in maximizing the exchange ratio and were material, this allegation only concerns three of the seven members of Cyan's board and does not show that a majority of Cyan's board faced disabling conflicts of interest in approving the Merger.[46]

### 2. Plaintiffs Fail to Plead Sufficient Facts Supporting a Reasonable Inference that a Majority of Cyan's Board Acted in Bad Faith

Plaintiffs' sole allegation of bad faith is based on defendants' refusal to supplement the Proxy after receiving a July 20, 2015 letter from plaintiffs' counsel asking them to do so shortly before the stockholder meeting to consider the Merger

---

[45] Compl. ¶¶ 19-21.

[46] The Complaint also alleged that Hatfield and Floyd "will be rewarded with lucrative executive positions at Ciena upon the close of the Merger; with Hatfield most likely becoming Senior Vice President at Ciena." Compl. ¶ 88. But plaintiffs did not pursue this argument in briefing (or at oral argument) and thus waived it. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

was held on July 31.[47] As discussed below, none of plaintiffs' disclosure allegations has merit, thus the Cyan board's refusal to supplement the Proxy as requested by plaintiffs cannot amount to bad faith.

Even if reasonable minds could differ over the merits of plaintiffs' disclosure allegations, furthermore, the Complaint contains no non-conclusory allegation that could support a reasonable inference that the Cyan board members demonstrated "a conscious disregard for [their] duties,"[48] or that the decision not to supplement the Proxy was "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[49]

\* \* \* \* \*

For the reasons explained above, plaintiffs have failed to state a non-exculpated breach of fiduciary duty claim against defendants. Count I thus must be dismissed.

## B. A Majority of Disinterested Stockholders of Cyan Approved the Merger in a Fully Informed, Uncoerced Vote

As a second and independent ground for dismissal of Count I, defendants seek to invoke the cleansing effect flowing from a fully informed, uncoerced stockholder vote under *Corwin* and its progeny.

---

[47] *See* Pls.' Answering Br. 33-34.

[48] *Lyondell*, 970 A.2d at 243.

[49] *Crescent/Mach I P'rs, L.P.*, 846 A.2d at 981.

25

In *Corwin*, the Delaware Supreme Court held that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[50] The fundamental policy underlying *Corwin* is to avoid "judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction themselves."[51] Later, in *Singh v. Attenborough*, our Supreme Court further explained that: "When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful."[52]

Here, plaintiffs do not allege that the stockholder vote on the Merger was coerced or that the Merger failed to receive the approval of a disinterested majority of stockholders. The *Corwin* doctrine thus applies if the stockholder vote approving the Merger was fully informed.

"[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks

---

[50] *Corwin*, 125 A.3d at 308-09.

[51] *Id.* at 313.

[52] *Singh*, 137 A.3d at 151-52.

shareholder action."[53]   A fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[54] Stated differently, material facts are those that, if disclosed, would "significantly alter the 'total mix' of information made available."[55]

"The application of [the materiality] standard does not require a blow-by-blow description of events leading up to the proposed transaction.  That is, the directors are 'not required to disclose all available information,' but only that information necessary to make the disclosure of their recommendation materially accurate and complete."[56]  "[A] plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote."[57]

Although the Complaint lists something in the neighborhood of twenty disclosure deficiencies, all but one of which plaintiffs had identified before the

---

[53] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[54] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[55] *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1277 (Del. 1994).

[56] *Matador Capital Mgmt. Corp. v. BRC Hldgs, Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998) (internal citation omitted).

[57] *In re Solera Hldgs, Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017).

Merger,[58] plaintiffs tellingly did not believe the deficiencies were serious enough to warrant seeking an injunction to prevent an allegedly uninformed stockholder vote. In any event, by letter dated February 6, 2017, plaintiffs identified their "three strongest disclosure claims," which I address below.

### 1. Jefferies' Conflicts of Interest

Plaintiffs allege that the Proxy is "materially misleading as to the Board's acknowledgement of Jefferies' conflict of interest in giving advice on a strategic transaction."[59] Specifically, plaintiffs assert that:

(a) The Proxy and Amended S-4 incorrectly state that during the January 27, 2015 Board meeting it was noted that the notes '*could*' result in Jefferies having an interest in the outcome of a strategic transaction, but the minutes of that meeting acknowledge that Jefferies '*would*' have an interest in such an outcome.

(b) The Proxy and Amended S-4 fail to disclose that [the General Counsel of Cyan] noted that the Committee and, eventually the full Board, would want to consider these factors [*i.e.*, that (1) Jefferies had purchased convertible notes and related warrants and (2) is a defendant in the securities litigation related to the Company's IPO and that the Company was indemnifying Jefferies] in connection with evaluating the advice and, if applicable, any fairness opinion by Jefferies.[60]

---

[58] *See* Compl. ¶¶ 103-15. Plaintiffs' counsel sent a letter to defendant's counsel on July 20, 2015, asserting a list of disclosure deficiencies substantially similar to those asserted in the Complaint. *See* Verified Second Am. Class Action Compl. Ex. A. The only disclosure deficiency in the Complaint that was not identified in the July 20 letter concerns one aspect of Jefferies' financial analysis. *See* Compl. ¶ 108. The stockholders meeting to consider approving the Merger was held on July 31, 2015.

[59] Compl. ¶ 113.

[60] *Id.* (emphasis added).

Assuming *arguendo* that the Proxy inaccurately characterized the board's assessment as of its January 27, 2015 meeting concerning the nature of Jefferies' interest in the Merger due to its convertible note holdings,[61] and that the Proxy omitted the comment Cyan's General Counsel made on the subject at that meeting, those deficiencies are immaterial. In my view, the information about Jefferies that plaintiffs assert should have been disclosed would not "significantly alter the 'total mix' of information made available"[62] to Cyan's stockholders given the extensive disclosures concerning Jefferies' potential conflicts of interest that were included in the Proxy, including the following:

> On January 27, 2015 . . . [t]he committee then reviewed the terms of a proposed engagement letter to formally engage Jefferies as Cyan's financial advisor for a potential strategic transaction. Management and the committee discussed that, in connection with the backstop provided by Jefferies at Cyan's request in Cyan's convertible debt and warrants offering in December 2014, Jefferies had purchased, and held, $5.5 million of Cyan's 8% convertible notes and related warrants and, as such, could have an interest in the outcome of a strategic transaction in addition to the fee arrangement from its financial advisory engagement. The committee also noted that as a result of certain securities litigation related to the Company's initial public offering, Jefferies was being indemnified by Cyan from potential liabilities in connection with that litigation. The committee discussed these factors and concluded that they would not present a conflict of interest that would preclude

---

[61] Defendants also make a persuasive argument that it was appropriate for the Proxy to say that Jefferies "could" rather than "would" have an interest in the transaction as of January 27, 2015, because the transaction that was under discussion at that time was a purely stock-for-stock merger that would *not* result in a "Fundamental Change" under the indenture and thus would *not* trigger the make-whole payment for the convertible notes. Tr. Oral Arg. 45.

[62] *Arnold*, 650 A.2d at 1277.

29

Jefferies from rendering advice and, if applicable, an opinion in connection with a transaction, and authorized management to execute an engagement letter with Jefferies on the terms discussed with the committee.[63]

. . .

On April 28, 2015 . . . [t]he Strategic/Finance Committee then discussed the fact that given that Jefferies held convertible notes and warrants and because Ciena proposed to structure the transaction to result in a "Fundamental Change" which would trigger additional rights of the holders of convertible notes, Jefferies may be deemed to have an interest in the transaction. The Strategic/Finance Committee therefore determined it would be advisable to contact an additional disinterested financial advisor to perform an analysis with respect to the fairness, from a financial point of view, of the per share merger consideration to be received by the holders of Cyan common stock in the proposed transaction. After further discussion, the Strategic/Finance Committee authorized management to contact Houlihan Lokey to determine if Houlihan Lokey would perform such an analysis and prepare a written opinion to the Cyan board as to the fairness, from a financial point of view, of the per share merger consideration to be received by the holders of Cyan common stock in the merger, pursuant to the proposed terms of the merger agreement and its analysis thereof.[64]

. . .

Jefferies and its affiliates in the past have provided financial advisory and financing services unrelated to the mergers to Cyan, including, during the two-year period prior to the date of its opinion, having acted as an underwriter for the initial public offering of Cyan common stock in 2013 and as sole bookrunning manager in 2014 for an offering of the convertible notes in the aggregate principal amount of $50 million and the related warrants to purchase shares of Cyan common stock for which services during such two-year period Jefferies and its affiliates received an aggregate fee of approximately $3.0 million. As the Cyan

---

[63] Liston Aff. Ex. 1, at 77-78.

[64] *Id.* at 85.

board was aware, as of the date of Jefferies' opinion, Jefferies held approximately $5.5 million (representing approximately 11%) of the aggregate principal amount of the convertible notes and approximately 1,237,500 of the related warrants and that certain rights in respect of such convertible notes and warrants (including conversion rights and make-whole payments with respect to such convertible notes and exercisability in the case of such warrants) would be triggered in the event the merger is consummated. As the Cyan board also was aware, as of the date of Jefferies' opinion, such convertible notes and related warrants would have an implied convertible value upon consummation of the merger of approximately $12.2 million assuming Jefferies does not exercise its conversion rights and approximately $13.8 million assuming Jefferies exercises its conversion rights, in each case, inclusive of Jefferies' initial $5.5 million investment.[65]

As the above quotation demonstrates, the Proxy disclosed in detail Jefferies' holding of the convertible notes, the implied value of the notes upon consummation of the Merger, the fact that Jefferies was indemnified by Cyan in the Securities Litigation, and the Strategic/Finance Committee's decision to hire an additional financial advisor for a second fairness opinion after it had become apparent that the proposed transaction had been structured to result in a "Fundamental Change" thereby triggering the make-whole payment. Under these circumstances, it is not reasonably conceivable in my view that the word choice of "could" versus "would," and the comment of Cyan's General Counsel that described substantially similar information already disclosed elsewhere in the Proxy, would significantly alter the total mix of information made available to Cyan's stockholders.

---

[65] *Id.* at 99.

## 2. Cyan's Dependence on Windstream

Plaintiffs next argue that the Proxy failed to disclose the importance of revenues from Cyan's largest customer, Windstream, to the management projections contained in the Proxy. According to plaintiffs, "the Proxy and Amended S-4 fail to disclose the fact that the recent Windstream order substantially affected the Company's future performance and that the loss of that income would have a significant negative impact on Cyan."[66] This information, however, is adequately disclosed in the Proxy and documents expressly incorporated therein.

Under the section entitled "Cyan Management Projections," the Proxy disclosed the following:

> Important factors that may affect actual results and cause the Management Projections not to be achieved include . . . changes in the buying pattern of Cyan's largest customer . . . Previous versions of the Management Projections (other than the Tax Projections) provided to Ciena and Cyan's board and Jefferies were updated in order to reflect the improving revenue outlook between the third quarter of 2014 and the second quarter of 2015 resulting almost exclusively from two significant unforecasted orders Cyan received from its largest customer in the first and second quarters of 2015. Given that the specific orders driving business were to be fulfilled in 2015 and management did not have any visibility to any other specific drivers for revenues to continue at the higher levels in 2016 and beyond, the figures relating to 2016-2019 did not change in any material respect in the previous versions provided.[67]

---

[66] Compl. ¶ 112.

[67] Liston Aff. Ex. 1, at 108.

Three paragraphs later, the Proxy further stated:

> The Management Projections are forward-looking statements. For information on factors that may cause Cyan's future results to materially vary, see the information described in the sections entitled "Risk Factors" in Cyan's Annual Report on Form 10-K for the fiscal year ended December 31, 2014, Cyan's Quarterly Report on Form 10-Q for the period ended March 31, 2015, and in other documents incorporated by reference into this proxy statement/prospectus.[68]

The "Risk Factors" sections of Cyan's Form 10-K for the 2014 fiscal year and Form 10-Q for the first quarter of 2015 contain substantially identical disclosures concerning Cyan's dependence on Windstream.[69] In fact, the first item disclosed in the "Risk Factors" section in both forms is Cyan's dependence on Windstream. The Form 10-Q for the first quarter of 2015, for example, disclosed the following, with the emphasis in the original:

> ***We currently generate the majority of our revenue from a concentrated base of customers, including Windstream Corporation. Unless we can substantially expand our sales to other existing or new customers, our period-to-period revenue may be highly volatile and we will not be able to grow our revenue.***
>
> For the years ended December 31, 2014, 2013 and 2012, revenue from Windstream represented approximately 29%, 39% and 45% of our total revenue. In recent periods, sales to Windstream have been highly volatile from quarter to quarter. For example, sales to Windstream declined from $19.0 million, or 50% of total revenue, in the third quarter of 2013 to $2.3 million, or 11% of total revenue, in the fourth

---

[68] *Id.* at 109; *see also id.* at 45.

[69] The major difference between the relevant disclosures in the 10-K and 10-Q referenced above is that the 10-Q also disclosed certain information relating to Cyan's revenue from Windstream during the first quarter of 2015.

quarter of 2013 and to $1.1 million, or 6% of total revenue, in the first quarter of 2014. The unanticipated 88% decline in revenue from Windstream from the third to the fourth quarters of 2013 resulted in our overall revenue in the fourth quarter of 2013 being substantially lower than we or the market anticipated. In the third quarter of 2014, sales to Windstream decreased to $5.6 million or 21% of total revenue from $6.7 million, or 28% of total revenue in the second quarter of 2014, but increased to $15.8 million or 52% in the fourth quarter of 2014 and $16.9 million or 47% in the first quarter of 2015.

While our sales to Windstream have been volatile, and can be potentially highly volatile, from quarter to quarter, we nonetheless anticipate that a significant portion of our revenue in 2015 and beyond will continue to depend on sales to Windstream especially as we have been selected by Windstream for additional upgrades to its regional and metro networks across major markets to 100G capacity. If our sales to Windstream decrease materially in any period, our revenue and results of operations would be adversely affected.

. . .

Sales of our solutions to our customers, including Windstream, are made pursuant to purchase orders, and not pursuant to long-term, committed-volume purchase contracts. As a result, we cannot assure you that we will be able to sustain or increase sales to any current or future customer from period to period, or that we will be able to offset the discontinuation of concentrated purchases by these customers with purchases by new or other existing customers. As a consequence of our customer concentration and the frequently concentrated nature of our customers' purchases, our quarterly revenue and operating results may fluctuate substantially from quarter to quarter and are difficult to predict. The loss of, or a significant delay or reduction in purchases by, any of our significant customers has in the past and could in the future adversely affect our business and operating results.[70]

---

[70] Cyan, Inc., Form 10-Q (May 13, 2015), at 32, *available at* https://www.sec.gov/Archives/edgar/data/1391636/000139163615000055/cyni-3312015x10q.htm (emphasis in original).

As plaintiffs acknowledge, this Court at times has considered materials explicitly incorporated into a proxy statement to be part of the total mix of information available to stockholders.[71] It is appropriate to apply the "incorporation by reference" doctrine here, in my view, because the language incorporating the Form 10-K and Form 10-Q appears in a section of the Proxy where stockholders reasonably would expect to find the relevant information, and because the information was conspicuously laid out in the incorporated documents so that a reasonable stockholder reading the Proxy could find it without difficulty.[72] For these reasons, plaintiffs' disclosure challenge concerning Cyan's dependence on Windstream is without merit.[73]

---

[71] Tr. Oral Arg. 95; *see e.g.*, *Orman*, 794 A.2d at 34-35; *Solera*, 2017 WL 57839, at *10.

[72] By contrast, if the incorporation and the disclosures in the incorporated documents are "buried," the Court may find the disclosure to be insufficient. *See Vento v. Curry*, 2017 WL 1076725, at *3-4 (Del. Ch. Mar. 22, 2017).

[73] To the extent plaintiffs argue that the Proxy specifically should have disclosed that "the 2015 Momentum Plan" reflected a high degree of dependence on Windstream and that Cyan received a $28 million purchase order from Windstream, I find that information to be immaterial. *See* Pls.' Answering Br. 19. The Proxy, the 10-K, and the 10-Q disclosed that Cyan received "two significant unforecasted orders" "from its largest customer in the first and second quarters of 2015," that Cyan was highly dependent on revenues from Windstream, its largest customer, and that the Windstream revenues had been volatile. The further disclosure of the exact magnitude of a particular order from Windstream or the name of a management plan (as opposed to management projections generally) would not significantly alter the total mix of information.

### 3. Jefferies' Precedent Transactions Analysis

The last of plaintiffs' "three strongest disclosure claims" challenges the omission from the Proxy of a "Selected Software & Network Management Precedent Transactions" analysis that appeared in the appendix of a powerpoint presentation Jefferies provided to the board on May 3, 2015.[74] Plaintiffs do not dispute that the Proxy accurately disclosed another precedent transactions analysis—entitled "Selected Network Communications Precedent Transactions"—that Jefferies performed from its review of "financial data relating to . . . 11 selected transactions which Jefferies in its professional judgment considered generally relevant for comparative purposes as transactions involving target companies with operations in the network communications industry."[75]

"[A] complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations. Likewise, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[76] Under Delaware law, "[s]tockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon

---

[74] *See* Compl. ¶ 107.

[75] *See* Liston Aff. Ex. 1, at 96; Tr. Oral Arg. 96.

[76] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016).

whose advice the recommendations of their board as to how to vote on a merger or tender rely."[77] "A fair summary, however, is a *summary*. By definition, it need not contain all information underlying the financial advisor's opinion or contained in its report to the board."[78]

As mentioned above, the "Selected Software & Network Management Precedent Transactions" that is the subject of plaintiffs' disclosure challenge appeared in the appendix of Jefferies' powerpoint presentation.[79] Significantly, a footnote right below that analysis stated: "Shown for informational purposes for [Cyan] software business, for which revenue of $10M in 2015E and $21M in 2016E is projected per [Cyan] management."[80] In other words, the "Selected Software & Network Management Precedent Transactions" analysis was performed for "informational purposes" for Cyan's "software business," which was projected to

---

[77] *In re Pure Res. Inc. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002).

[78] *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 900 (Del. Ch. 2016) (emphasis in original).

[79] Project Cougar Presentation to Board of Directors (May 3, 2015) (hereinafter "Project Cougar Presentation") at 29, 30. A copy of the powerpoint was provided to the Court during the motion to dismiss hearing, but it was incorporated by reference into the Complaint. *See* Compl. ¶ 107; *Amalgamated Bank*, 132 A.3d at 797 ("The incorporation-by-reference doctrine permits a court to review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one.").

[80] Project Cougar Presentation at 30.

account for only 5% of Cyan's total projected revenue of $200 million in 2015,[81] as opposed to for Cyan as a whole.

By contrast, the "Selected Network Communications Precedent Transactions" analysis that Jefferies performed for Cyan as a whole appeared in the body of its powerpoint presentation—not in the appendix.[82] The numerical ranges derived from that analysis, furthermore, appeared in the "Summary Financial Analysis" slide in the powerpoint and are identical to the numerical ranges disclosed in the Proxy,[83] which confirms that Jefferies did not rely on the "Selected Software & Network Management Precedent Transactions" analysis in rendering its fairness opinion.

Our case law only requires disclosure of a fair summary of a financial advisor's work. The Proxy fully and accurately disclosed the precedent transactions analysis Jefferies performed to value Cyan as a whole. The failure to disclose a supplemental analysis that concerned a small fraction (5%) of the company's estimated revenues and that the financial advisor ostensibly did not rely on in

---

[81] *See* Liston Aff. Ex. 1, at 109 (projecting Cyan's total revenue in 2015 to be $200 million).

[82] *See* Project Cougar Presentation at 27; Liston Aff. Ex. 1, at 96; Tr. Oral Arg. 96.

[83] *Compare* Project Cougar Presentation at 24 *with* Liston Aff. Ex. 1, at 96.

rendering its fairness opinion is not material in my view. Therefore, plaintiffs fail to state a disclosure claim concerning Jefferies' precedent transactions analysis.

* * * * *

For the foregoing reasons, none of plaintiffs' "three strongest" disclosure claims is viable. Having reviewed the rest of plaintiffs' disclosure claims, most of which are of the "tell me more" variety and all of which are concededly weaker than the three discussed above, I conclude that each of them also falls short of identifying a material misrepresentation or omission and that the stockholder vote approving the Merger was fully informed. Accordingly, and because plaintiffs do not assert that the Cyan board's decision to approve the Merger amounted to waste, Count I of the Complaint must be dismissed for failure to state a claim for relief under *Corwin* and its progeny.[84]

## C. Count II Fails to State a Claim for Relief to Warrant the Imposition of a Quasi-Appraisal Remedy

Count II of the Complaint, which is styled as a "Claim for Equitable Relief," seeks the "remedy of quasi-appraisal" based on the disclosure allegations in the Complaint.[85] Plaintiffs assert that by "withholding the critical and material information detailed [in the Complaint]," defendants deprived the stockholders of

---

[84] *Attenborough*, 137 A.3d at 151-52.

[85] Compl. ¶¶ 134-38.

Cyan of "sufficient information to determine whether to pursue their statutory appraisal rights."[86]

In *In re Orchard Enterprises, Inc. Stockholder Litigation*, the Court explained based on a thorough analysis of Delaware law that "quasi-appraisal" is simply a form of remedy:

> "Quasi-appraisal" is simply a short-hand description of a measure of damages. It refers to the quantum of money equivalent to what a stockholder would have received in an appraisal, namely the fair value of the stockholder's proportionate share of the equity of the corporation as a going concern. . . . Because quasi-appraisal is a measure of damages, different causes of action can give rise to a quasi-appraisal remedy, just as different causes of action can give rise to other forms of remedies.[87]

The Court further explained that "[o]ne cause of action where the Delaware Supreme Court and the Court of Chancery consistently have held that quasi-appraisal damages are available is when a fiduciary breaches its duty of disclosure in connection with a transaction that requires a stockholder vote."[88]

As a threshold matter, because I have concluded that plaintiffs' disclosure allegations are without merit, plaintiffs' request for the remedy of quasi-appraisal based on those allegations must be dismissed as well. In addition, Count II must be dismissed because the cause of action underlying the remedy sought is an alleged

---

[86] *Id.* ¶ 136.

[87] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 42 (Del. Ch. 2014).

[88] *Id.*

breach of fiduciary duty and, as discussed above, plaintiffs have failed to plead a non-exculpated claim for breach of fiduciary duty.

In an effort to circumvent the effect of the exculpatory provision in Cyan's certificate of incorporation, plaintiffs argue that their "equitable claim is for frustration of the statutory right of appraisal, not breach of fiduciary duty."[89] Thus, according to plaintiffs, the exculpatory provision in Cyan's certificate of incorporation, which only exculpates defendants from liability for "monetary damages for breach of fiduciary duty as a director,"[90] does not apply to Count II.

Plaintiffs' argument runs counter to the well-reasoned conclusion in *Orchard*, quoted above, that "quasi-appraisal" is simply a form of remedy. Indeed, plaintiffs fail to identify a single case in Delaware that recognizes a cause of action for "frustration of the statutory right of appraisal" under similar circumstances.[91] I thus see no basis to invent such a cause of action here.

As importantly, the allegations underlying Count II demonstrate, despite plaintiffs' protestations to the contrary, that the claim actually is predicated on the

---

[89] Pls.' Answering Br. 55.

[90] Liston Aff. Ex. 8, at Article 8.1.

[91] *See* Pls.' Answering Br. 54-55; Tr. Oral Arg. 100.

theory that the defendants breached a fiduciary duty of disclosure. For example, plaintiffs allege that:

- Defendants further ***breached their fiduciary duties*** to Cyan stockholders . . . when they filed the Proxy, recommending that Cyan's public stockholders vote in favor of the Merger. However, as described herein, the S-4 and Proxy fail to disclose material information to Company stockholders, ***in bad faith breach of the Individual Defendants' duty of candor. . . . As a result, Plaintiffs and the class are entitled to a quasi-appraisal remedy***.[92]

- On June 30, 2015, Defendants caused to be filed the Proxy and the Amended S-4 on June 26, 2015, which ***fails to disclose material information*** and prevented stockholders from casting an informed vote on whether to approve the Merger or seek appraisal. ***Accordingly, Plaintiffs and the class are entitled to a quasi-appraisal remedy.***[93]

- [T]he Individual Defendants ***breached their duty of candor*** by failing to disclose to Plaintiffs and the Class all material information and this prevented them from casting an informed vote on whether to tender their shares into the Merger or seek appraisal rights. ***As a result, Plaintiffs and the Class are entitled to a quasi-appraisal remedy***.[94]

When the cause of action supporting plaintiffs' request for a quasi-appraisal remedy is for breach of a fiduciary duty, plaintiffs cannot circumvent the protection afforded

---

[92] Compl. ¶ 14 (emphasis added).

[93] *Id*. ¶ 103 (emphasis added).

[94] *Id*. ¶ 130 (emphasis added).

in Cyan's certificate of incorporation through artful pleading.[95]  To hold otherwise would undermine the very purpose of 8 *Del. C.* § 102(b)(7).

## III.  CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Complaint with prejudice is GRANTED.

**IT IS SO ORDERED**.

---

[95] *Cf. Simon v. Navellier Series Fund*, 2000 WL 1597890, at *5 n.18 (Del. Ch. Oct. 19, 2000) (citing cases for the proposition that "artful pleading" designed to circumvent enforcement of the parties' contractual choice of forum is not permitted); *Charlotte Broad., LLC v. Davis Broad. of Atlanta LLC*, 2013 WL 1405509, at *3 (Del. Ch. Apr. 2, 2013) ("artful pleading will not convert a legal matter into an equitable one.").